Michelle D. Sinnott (AK Bar No. 1506049)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA
121 W. Fireweed Ln., Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
msinnott@trustees.org
bbrisson@trustees.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, ALASKA WILDERNESS LEAGUE, NATIONAL WILDLIFE REFUGE ASSOCIATION, SIERRA CLUB, and WILDERNESS WATCH, <br><br> Plaintiffs, <br> v. <br><br> U.S. ARMY CORPS OF ENGINEERS and COLONEL VICTOR TRUJILLO, in his official capacity as Commander of the Alaska District of the U.S. Army Corps of Engineers, <br><br> Defendants. | Case No. 3:26-cv-00272 |

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>
(Clean Water Act, 33 U.S.C. § 1344; National Environmental Policy Act, 42 U.S.C. §§ 4321–4336f; Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3161–3173; Wilderness Act, 16 U.S.C §§ 1131–1136; and Administrative Procedure Act, 5 U.S.C. §§ 702–706)

Plaintiffs Friends of Alaska National Wildlife Refuges, Alaska Wilderness

League, National Wildlife Refuge Association, Sierra Club, and Wilderness Watch

(collectively "Friends") file this Complaint for Declaratory and Injunctive Relief, alleging:

## NATURE OF THE CASE

1. Friends, and their members and supporters, bring this litigation to protect their interests in the Izembek National Wildlife Refuge (Izembek or Refuge) and Izembek's designated Wilderness from the construction of a road in violation of the Clean Water Act (CWA), the National Environmental Policy Act (NEPA), the Alaska National Interest Lands Conservation Act (ANILCA), the Wilderness Act, and the Administrative Procedure Act (APA).

2. On July 9, 2026, the U.S. Army Corps of Engineers (Corps) issued a CWA Section 404 permit (Permit) to the Alaska Department of Transportation and Public Facilities (AKDOT) authorizing the construction of an 18.9-mile road through Izembek. The Corps also issued a Memorandum for Record (Memo) to accompany the Permit. This road would be built largely on lands subject to existing litigation challenging the U.S. Department of Interior's (Interior's) unlawful decision to execute a land exchange with the King Cove Corporation (KCC). That land exchange agreement traded a road corridor within Izembek's Wilderness for KCC-owned lands. The purpose of the land exchange was to allow for the construction of a road connecting the communities of King Cove and Cold Bay. *See Friends of Alaska Nat'l Wildlife Refuges v. Burgum*, No. 3:25-cv-00318-SLG (D. Alaska).

3. In issuing the Permit, the Corps did not comply with procedural and substantive requirements in the CWA and NEPA. The Corps also failed to follow the requirements of Title XI of ANILCA, which provides the sole process for authorizing a road within Izembek and requires approval by Congress, and violated the Wilderness Act, which prohibits roads through Wilderness.

4. The Corps Memo and Permit are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

5. Friends seeks vacatur of the Corps Memo and the Permit.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. §§ 2201–02 (declaratory and injunctive relief) and 28 U.S.C. § 1331 (federal question jurisdiction).

7. The Memo and Permit are final agency actions for which Friends has a right to judicial review under the APA. 5 U.S.C. §§ 702, 704.

8. The sovereign immunity of Defendants U.S. Army Corps of Engineers and Col. Victor Trujillo in his official capacity as Commander of the Alaska District is waived pursuant to the APA. 5 U.S.C. § 702.

9. Venue is proper in the District of Alaska under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred within the District of Alaska, and Izembek is in Alaska.

10.     Plaintiff Friends of Alaska National Wildlife Refuges is a nonprofit organization founded in 2005 and based in Anchorage, Alaska. It is a volunteer group that works to assist the U.S. Fish and Wildlife Service (Service) to accomplish its congressionally-mandated mission for the sixteen National Wildlife Refuges in Alaska. Its mission is to promote the stewardship of all Alaska National Wildlife Refuges through education, support, and advocacy, and to assist the Service through outreach to decision-makers. It has sent members and supporters to Izembek for volunteer projects in the past and is planning to organize future volunteer projects.

11.     Plaintiff Alaska Wilderness League is a nonprofit organization founded in 1993 to further the protection of public lands and waters in Alaska, including national wildlife refuges and Wilderness, such as Izembek. Its mission is to lead the effort to preserve Alaska's wild lands and waters by engaging citizens and decision-makers. It has offices in Anchorage and Washington, D.C., as well as other locations.

12.     Plaintiff National Wildlife Refuge Association is a nonprofit organization focused exclusively on protecting and promoting the 850-million-acre National Wildlife Refuge System, the world's largest network of lands and waters set aside for wildlife conservation. Founded in 1975, its mission is to conserve America's wildlife heritage for future generations through strategic programs that enhance the National Wildlife Refuge System and the landscapes beyond its boundaries. With approximately 80% of the land mass of the National Wildlife Refuge System in Alaska, the National Wildlife Refuge

Association has, throughout its history, focused significant resources on protecting and enhancing Refuge System resources throughout the state, including Izembek.

13. Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization. Sierra Club is a national nonprofit organization with over 604,400 members dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club's concerns encompass a variety of environmental issues in Alaska and beyond, including an interest in protecting designated Wilderness. The Alaska Chapter of the Sierra Club has just over 1,200 members.

14. Plaintiff Wilderness Watch is a nonprofit organization founded in 1989. Its mission is to defend the nation's 111-million-acre National Wilderness Preservation System. Wilderness Watch advocates for appropriate stewardship according to the requirements of the Wilderness Act of 1964. Wilderness Watch monitors agency stewardship of designated Wilderness in Alaska and organizes its members to participate in public processes in Alaska that impact designated Wilderness.

15. Friends and their members and supporters have long-standing interests in protecting Izembek from a road bisecting the isthmus. These interests include preserving and enjoying the wildlife, habitat, and wilderness values of Izembek for recreational, aesthetic, and environmental protection purposes. Friends' staff, members, and supporters

have visited Izembek, enjoyed viewing its wildlife, and experienced the Wilderness and habitat that Izembek provides. Friends and their members have strong recreational, aesthetic, scientific, economic, and other interests in the wildlife that uses and depends on Izembek, including migratory birds and terrestrial mammals. Friends' staff, members, and supporters intend to return to Izembek to continue to view wildlife, recreate, hunt, and guide.

16. To protect their interests in Izembek, Friends and their members and supporters have engaged in various past public processes, including reviews undertaken pursuant to the CWA, NEPA, ANILCA, Wilderness Act, and other administrative processes, regarding a land exchange and authorizations for a road. They have also engaged in lobbying and other legislative work to protect their interests in Izembek. They provided comments on the AKDOT's CWA permit application, calling attention to numerous issues with the permit under the CWA, NEPA, and ANILCA.

17. Friends' and their members' and supporters' interests in Izembek are adversely affected by the Permit. Building a road through Izembek and its designated Wilderness harms the recreational, aesthetic, scientific, economic, and other interests of Friends and their members and supporters, who use and enjoy these lands and the wildlife that depends on them.

18. Authorizing construction of a road through Izembek without following the substantive and procedural requirements of the CWA, NEPA, ANILCA, Wilderness Act,

and APA harms the interests of Friends and their members and supporters in engaging in public processes and informing agency decision-making.

19. The Permit authorizes construction of a road, which is slated to begin as soon as August 8, 2026. The construction of a road through Izembek and its designated Wilderness will permanently alter the existing landscape and further exacerbate the injuries to Friends and their members and supporters. These actions harm Friends' and their members' and supporters' strong recreational, aesthetic, scientific, economic, and other interests in Izembek.

20. These actual, concrete injuries are fairly traceable to the Corps' decision to issue the Permit and its failure to adhere to substantive requirements and decision-making procedures. Friends' injuries would be redressed by the relief sought in this case.

### DEFENDANTS

21. Defendant U.S. Army Corps of Engineers is a branch of the U.S. Army and part of the U.S. Department of Defense. The Corps is authorized to issue permits for the discharge of dredged or fill material into waters of the United States under Section 404 of the CWA.

22. Defendant Colonel Victor Trujillo is being sued in his official capacity. As the Commander of the U.S. Army Corps of Engineers, Alaska District, he is charged with the supervision and management of all decisions, operations, and activities of the Corps Alaska District. He assumed command of the Alaska District in June 2026. The Permit was signed on his behalf.

## STATUTORY FRAMEWORK

23.     Congress enacted the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA sets several goals, including attainment and preservation of "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." *Id*. § 1251(a)(2). The CWA prohibits "discharge of any pollutant" into navigable waters except in accordance with its mandates. *Id*. § 1311(a).

24.     The issuance of discharge permits to fill wetlands under Section 404 of the CWA is governed by the Environmental Protection Agency's (EPA) 404(b)(1) Guidelines (Guidelines). 33 U.S.C. § 1344; 40 C.F.R. pt. 230.

25.     "Most wetlands constitute a productive and valuable public resource." 33 C.F.R. § 320.4(b)(1). Therefore, the "unnecessary alteration or destruction of wetlands" "may represent an irreversible loss of valuable aquatic resources" and "should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(1); 40 C.F.R. § 230.1(d).

26.     Pursuant to the Guidelines, dredged or fill material "should not be discharged into the aquatic ecosystem" unless the applicant demonstrates that the proposed discharge "will not have an unacceptable adverse impact." 40 C.F.R. § 230.1(c).

27. The Corps cannot authorize a discharge without "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with [the] Guidelines." *Id*. § 230.12(a)(3)(iv).

28. Additionally, the Guidelines prohibit the permitting of any discharge of dredged or fill material if there is a less environmentally damaging practicable alternative to the proposed discharge, if the discharge would cause or contribute to significant degradation of the environment, or unless all appropriate steps have been taken to minimize potential adverse impacts. *Id*. § 230.10.

29. Under the CWA, the Corps may issue a 404 permit only "after notice and opportunity for public hearings." 33 U.S.C. § 1344(a). The CWA regulations further require that the notice "must…include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment." 33 C.F.R. § 325.3(a).

30. NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for every major federal action that will have a significant impact on the quality of the human environment. 42 U.S.C. § 4332(2)(C).

31. Such a statement is required to consider any "reasonably foreseeable environmental effects of the proposed agency action[,]" "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented[,]" and "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the

proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal." *Id*.; *see also id*. § 4332(F) (separately requiring agencies to "study, develop, and describe technically and economically feasible alternatives").

32.     ANILCA Title XI establishes a "single comprehensive statutory authority for the approval or disapproval of applications for [transportation and utility] systems" through Alaska public lands. 16 U.S.C. § 3161(c). This applies to roads constructed within conservation system units, including National Wildlife Refuges and designated Wilderness. *Id*. § 3162(4)(A).

33.     Title XI requires that transportation systems "be approved or disapproved in accordance with the procedures set forth in this subchapter." *Id*. § 3162.

34.     Transportation systems may not be authorized through designated Wilderness without a recommendation by the President and approval by Congress. *Id*. § 3166(b), (c).

35.     Title XI's procedures are mandatory: "Notwithstanding any provision of applicable law, no action by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole or in part, of any transportation or utility system shall have any force or effect unless the provisions of this section are complied with." *Id*. § 3164(a).

36.     The Wilderness Act was enacted to protect for "present and future generations the benefits of an enduring resource of wilderness" and establish the National

Wilderness Preservation System to protect areas and provide for their use and enjoyment as unimpaired Wilderness. *Id*. § 1131(a).

37.    Congress directed that Wilderness be managed to preserve its wilderness character, and it devoted Wilderness to "the public purposes of recreational, scenic, scientific, educational, conservation, and historical use." *Id*. § 1133(b); *see also* Alaska National Interest Lands Conservation Act, Pub. L. No. 96–487, § 707, 94 Stat. 2418 (1980) [hereinafter ANILCA] ("[W]ilderness designated by this Act shall be administered in accordance with applicable provisions of the Wilderness Act . . . .").

38.    The Wilderness Act provides that

[e]xcept as specifically provided for in this chapter, and subject to existing private rights, there shall be . . . no permanent road within any wilderness area designated by this chapter and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter . . . , there shall be . . . no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

16 U.S.C. § 1133(c).

39.    The APA provides for judicial review of actions taken by administrative agencies. 5 U.S.C. §§ 702, 704.

40.    The APA instructs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or are "without observance of procedure required by law." *Id*. § 706(2)(A), (D).

## FACTUAL BACKGROUND

### I. Izembek's History and Values

41. Izembek has been recognized for decades as an area with particularly valuable wildlife habitat.

42. Efforts to protect Izembek began in the early 1940s. Interior first designated the Izembek National Wildlife Range (Range) for protection in 1960, recognizing that it "contains the most important concentration point for waterfowl in Alaska." Public Land Order 2216, Establishing the Izembek National Wildlife Range, 25 Fed. Reg. 12599, 12600 (Dec. 6, 1960); Press Release, Off. of the Sec'y, Dep't of the Interior, Secretary Seaton Creates Izembek National Wildlife Range in Alaska (Dec. 7, 1960).

43. The Range's importance was reaffirmed in 1980, when Congress renamed the Range as the Izembek National Wildlife Refuge and designated approximately 300,000 of the 315,000 acres as Wilderness. ANILCA §§ 303(3)(A), 702(6).

44. Congress added the following specific purposes for Izembek:

(i) [To] conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl, shorebirds and other migratory birds, brown bears and salmonoids;

(ii) [T]o fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;

(iii) [T]o provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and

(iv) [T]o ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.

---

*Friends of Alaska Nat'l Wildlife Refuges v. U.S. Army Corps of Eng'rs*
Case No. 3:26-cv-00272 Page 12 of 41

*Id*. § 303(3)(B).

45.     When drafting ANILCA, Congress noted:

> The Izembek Wilderness possesses outstanding scenery, key populations of brown bear, caribou and other wilderness-related wildlife, and critical watersheds to Izembek Lagoon. About 68 percent of the total lands in Izembek Lagoon are covered with the largest eel grass beds in the world. These beds are utilized by millions of waterfowl for migration and wintering purposes. A wilderness designation will protect this critically important habitat by restricting access to the lagoon.

H. R. REP. NO. 96-97, Part II, at 136 (1979).

46.     Izembek is one of the world's most important migratory bird staging and wintering habitats, supporting millions of migratory waterfowl and shorebirds in its coastal lagoons and freshwater wetlands complex. *See* U.S. FISH & WILDLIFE SERV., IZEMBEK NATIONAL WILDLIFE REFUGE LAND EXCHANGE/ROAD CORRIDOR FINAL ENVIRONMENTAL IMPACT STATEMENT 3-105 (2013) [hereinafter 2013 Final EIS].

47.     Izembek and its adjacent wetlands and nearshore marine environment provide habitat for several species protected under the Endangered Species Act, such as the Steller's eider, northern sea otter, and Steller sea lion. *Id*. at 3-172, 3-179, 3-184.

48.     Izembek also provides high quality brown bear, caribou, and wolf habitat. *See id.* at 3-141, 3-145, 3-153. In particular, the Joshua Green River watershed supports the highest concentration of brown bears in the lower Alaska Peninsula. *Id*. at 3-141. Izembek's isthmus is an important migration corridor and provides wintering habitat for the Southern Alaska Peninsula caribou herd. *Id*. at 3-145–6.

---

49.     Izembek is internationally recognized for its unique and ecologically significant wetlands and wildlife. It was designated as a Wetland of International Importance by the Ramsar Convention on Wetlands of International Importance in 1986 ("Ramsar Convention"). *Id*. at 3-105. The Ramsar Convention is an international treaty, adopted by the United States, with a stated mission of "conservation and wise use of all wetlands through local and national actions and international cooperation." *Id*. at 3-46.

## II.     History of Efforts to Build a Road Through Izembek

50.     Interior has evaluated the effects of a road from King Cove to Cold Bay through Izembek multiple times.

51.     In the early 1980s, Interior conducted an analysis of a road through Izembek, concluding that a road would cause long-term damage to the Refuge's unique and ecologically important habitats. *See* U.S. FISH & WILDLIFE SERV., KING COVE ROAD BRIEFING REPORT 2 (1996) [hereinafter King Cove Road Briefing Report].

52.     In 1985, Interior concluded that "[t]he presence of a road [connecting King Cove and Cold Bay], vehicular traffic, and intensified human use could alter migratory patterns" of the "nearly 6,000–7,000" caribou that migrate through the isthmus twice a year between their wintering range and calving grounds, and that roads built in other areas of the state have "pose[d] a serious barrier to caribou movements." DEP'T OF INTERIOR, BRISTOL BAY REGIONAL MANAGEMENT PLAN AND FINAL ENVIRONMENTAL IMPACT STATEMENT 8-32 (1985).

---

Case 3:26-cv-00272     Document 1     Filed 07/22/26     Page 14 of 41

53. Interior further found that a road "would result in expanded human presence and traffic . . . provid[ing] greater access into a relatively remote, undisturbed region in the Joshua Green River drainage and in key bear use areas in Right and Lefthand valleys" such that "[b]ears could be expected to change their behavior . . . and might abandon some traditional use areas." *Id*. at 8-38.

54. Interior concluded that "[t]he King Cove-Cold Bay road could have major, local impacts" to wilderness values. *Id*. at 8-69.

55. In 1996, the Service again addressed the issue of a road through Izembek and again found that a road would have unacceptable environmental impacts. King Cove Road Briefing Report at 2–3.

56. In 1997, KCC offered to exchange KCC lands at the mouth of the Kinzarof Lagoon for a right-of-way through Izembek. The Service declined the offer because of the adverse impacts of a road to wildlife. U.S. FISH & WILDLIFE SERV., LAND PROTECTION PLAN FOR IZEMBEK NATIONAL WILDLIFE REFUGE COMPLEX, COLD BAY, ALASKA 53 (1998) [hereinafter Land Protection Plan].

57. Also in 1997, Senator Frank Murkowski introduced a bill that would have required the Secretary to allow road construction through Izembek. King Cove Health and Safety Act of 1997, S. 1092, 105th Cong. § 2(a) (1997). That bill was amended and eventually enacted as part of an appropriations act. Instead of mandating a road, the legislation expressly prohibited a road and authorized $37.5 million for various non-road projects to improve health and safety infrastructure and services in King Cove, including

Case 3:26-cv-00272     Document 1     Filed 07/22/26     Page 15 of 41

$2.5 million for improvements to the King Cove medical clinic. Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105-277, § 353, 112 Stat. 2681, 302–03 (1998) (specifically prohibiting the construction of any road or other facilities within Izembek).

58.     One of the projects Congress authorized was the purchase of a hovercraft and construction of a hovercraft facility outside of the Refuge. *Id*.

59.     In 1998, the Service stated that the proposal to build a road was "the greatest known potential threat to wildlife and wilderness values within the Izembek complex." Land Protection Plan at 53. The Service again noted the "significant wildlife and wilderness resources in the area," including important wintering area and migration corridor of caribou, an adjacent "key brown bear natal area that supports the highest densities of bears on the lower Alaska Peninsula," and "outstanding and essential habitat for a variety of species, including the threatened Steller's eider, Pacific black brant, tundra swan and emperor goose." *Id*.

60.     From 2001 to 2004, the Corps completed a NEPA review for the King Cove Access Project. *See* U.S. FISH & WILDLIFE SERV., RECORD OF DECISION IZEMBEK NATIONAL WILDLIFE REFUGE LAND EXCHANGE/ROAD CORRIDOR 6 (2013) [hereinafter 2013 ROD]. As part of the analysis, the Corps concluded that a hovercraft operating between terminals near King Cove and Cold Bay was the preferred alternative. *See id*.

61.     Following the Corps' analysis and decision, the Aleutians East Borough (Borough) purchased a hovercraft with appropriated federal funds and constructed a road

from King Cove to a hovercraft facility at Lenard Harbor. *Id*.; *see also* 2013 Final EIS at 2-7. The hovercraft began operating from the Lenard Harbor facility in 2007 and successfully completed "at least 22" requested medical evacuations during its operation. 2013 ROD at 6; *see also* 2013 Final EIS at 2-7.

62. The Borough suspended hovercraft operations in 2010, citing unreliability and cost, despite calling the hovercraft a "life-saving machine . . . doing what it is supposed to do." THE WILDERNESS SOC'Y, HISTORY OF THE PROPOSED ROAD THROUGH IZEMBEK NATIONAL WILDLIFE REFUGE 2 (2014). The Borough then sold the hovercraft but continued to advocate for construction of a road through Izembek. 2013 Final EIS app. I at 7–9.

63. After ending hovercraft operations, the Borough informed the Corps that, if a land exchange was not approved, the Borough intended to operate a landing craft/passenger ferry from the Northeast Terminal to Cold Bay. *Id*. at 7–10. The Borough therefore sought to retain the permit to build the road from Lenard Harbor to the Northeast Terminal. *Id*. Based on that information, the Corps maintained the permit. *Id*. at 11.

64. In 2009, Congress enacted legislation allowing the Secretary to decide whether to exchange Refuge lands and only allowed the Secretary to do so if it would be in the public interest. Omnibus Public Lands Management Act (OPLMA), Pub. L. No. 111-11, § 6402, 123 Stat. 1178, 1178–79 (2009).

---

Case 3:26-cv-00272    Document 1    Filed 07/22/26    Page 17 of 41

65. The Service prepared an EIS to analyze the impacts of the proposed exchange under OPLMA. *See* 2013 Final EIS. Former Secretary Sally Jewell decided not to proceed with the land exchange, finding that Izembek's wetlands are designated as a Wetland of International Importance under the Ramsar Convention, which the United States is "obligated to protect pursuant to treaties." *See* 2013 ROD at 5.

66. KCC, along with the Agdaagux Tribe of King Cove, the Native Village of Belkofski, the Borough, the City of King Cove, and two individuals, challenged former Secretary Jewell's decision in federal court. Compl. for Declaratory & Injunctive Relief, *Agdaagux Tribe of King Cove v. Jewell*, 128 F. Supp. 3d 1176 (D. Alaska 2015), ECF No. 1.

67. In September 2015, the U.S. District Court for the District of Alaska upheld Secretary Jewell's decision to not move forward with a land exchange and road construction. *Agdaagux Tribe of King Cove*, 128 F. Supp. 3d at 1200–01. The plaintiffs, including intervenor-plaintiffs the State of Alaska, appealed that decision to the U.S. Court of Appeals for the Ninth Circuit, but later voluntarily dismissed the case.

68. In 2015, the Corps completed an assessment of non-road alternatives for a transportation link between King Cove and Cold Bay. U.S. ARMY CORPS OF ENG'RS, ALASKA DIST., KING COVE-COLD BAY: ASSESSMENT OF NON-ROAD ALTERNATIVES (2015). This assessment included consideration of a ferry option, as well as two air options: a new airport in King Cove and a helicopter. *Id*. at i. The Corps' assessment

found that a ferry would be reliable 99.9% of the time and that the air options would also be highly reliable. *Id*. at ii.

69. In January 2018, Secretary Zinke signed an "Agreement for the Exchange of Lands" with KCC. Agreement for the Exchange of Lands Between King Cove Corporation and the United States (Jan. 22, 2018) [hereinafter 2018 Exchange Agreement].

70. The 2018 Exchange Agreement stated that "the United States will convey to KCC the surface and subsurface estate of up to 500 acres from within [the Refuge] that are identified by KCC as being needed for the construction, operation, and maintenance of a road linking King Cove with the Cold Bay airport (the U.S. Exchange Lands)." *Id*. at 1.

71. Friends of Alaska National Wildlife Refuges, The Wilderness Society, National Audubon Society, Wilderness Watch, Center for Biological Diversity, Defenders of Wildlife, National Wildlife Refuge Association, Alaska Wilderness League, and Sierra Club brought a lawsuit in federal district court challenging the 2018 Exchange Agreement. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127 (D. Alaska 2019).

72. In March 2019, the District Court granted summary judgment to the plaintiffs, holding that the 2018 Exchange Agreement constituted an unlawful agency action and was arbitrary and capricious under the APA. *Id*. at 1141–43.

73.     In July 2019, Secretary Bernhardt and KCC signed a new Exchange Agreement. Agreement for the Exchange of Lands Between King Cove Corporation and the United States (July 12, 2019) [hereinafter 2019 Exchange Agreement].

74.     Friends of Alaska National Wildlife Refuges, The Wilderness Society, National Audubon Society, Wilderness Watch, Center for Biological Diversity, Defenders of Wildlife, National Wildlife Refuge Association, Alaska Wilderness League, and Sierra Club brought a lawsuit challenging the 2019 Exchange Agreement in August 2019. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 463 F. Supp. 3d 1011 (D. Alaska 2020).

75.     The District Court held the Secretary's decision to enter into the 2019 Exchange Agreement constituted an unlawful agency action, violated ANILCA Title XI, and was "arbitrary and capricious under the APA." *Id*. at 1022. The Court vacated the 2019 Exchange Agreement. *Id*. at 1027.

76.     In March 2022, a three-judge Ninth Circuit panel reversed the District Court's decision. *Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, 29 F.4th 432, 444 (9th Cir. 2022).

77.     Plaintiffs petitioned for en banc rehearing of the panel decision. The Ninth Circuit granted the petition and vacated the panel decision. *Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, 54 F.4th 608, 609 (9th Cir. 2022).

78.     During the pendency of the Ninth Circuit's en banc review, former Secretary Haaland withdrew Interior from the 2019 Exchange Agreement citing

Case 3:26-cv-00272     Document 1     Filed 07/22/26     Page 20 of 41

"significant policy concerns regarding the manner in which the 2019 Land Exchange was accomplished, as well as the terms of that exchange." Deb Haaland, Sec'y of the Interior, Decision Memorandum to Withdraw from the 2019 Land Exchange Agreement Between the Secretary of the Interior and King Cove Corporation 1 (Mar. 14, 2023).

79. Based on Secretary Haaland's withdrawal from the 2019 Exchange Agreement, Interior moved to dismiss the appeal pending en banc review as moot. *Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, No. 20-35728, 2023 U.S. App. LEXIS 14927, at *4 (9th Cir. June 15, 2023). The Ninth Circuit granted Interior's motion to dismiss the appeal as moot and vacated the District Court decision. *Id*.

80. On October 21, 2025, Interior entered into yet another Exchange Agreement with KCC to allow for the construction of a road connecting the communities of King Cove and Cold Bay. Agreement for the Exchange of Lands Between King Cove Corporation and the United States (Oct. 21, 2025) [hereinafter 2025 Exchange Agreement].

81. The 2025 Exchange Agreement stated that the United States would convey to KCC land in Izembek to "provide a corridor for the construction and operation of a public road between King Cove and Cold Bay." *Id*. at 4. In exchange, KCC would convey lands to the United States and relinquish its selection rights under the Alaska Native Claims Settlement Act to 5,430 acres located within Izembek. *Id*. at 6.

---

Case 3:26-cv-00272    Document 1    Filed 07/22/26    Page 21 of 41

82.     On October 22, 2025, the Bureau of Land Management issued a Patent transferring 489.96 acres of surface and subsurface estate from the United States to KCC. U.S. Patent No. 50-2026-0001 (issued Oct. 22, 2025).

83.     Also on October 22, 2025, KCC issued a Warranty Deed for 1,737.24 acres to the United States for and in consideration of $48,050, which the United States paid to KCC to equalize the value of the lands conveyed. Warranty deed, No. 2025-000209-0, Recording District: 305 Aleutian Islands (Oct. 22, 2025).

84.     On November 11, 2025, Friends brought a lawsuit challenging the 2025 Exchange Agreement. *Friends of Alaska National Wildlife Refuges v. Burgum*, No. 3:25-cv-00318-SLG (D. Alaska). The case is fully briefed on motions for summary judgment but has not yet been resolved on the merits.

## III.     The Corps Permitting Process and Decision

85.     On November 19, 2025, AKDOT applied for a CWA Section 404 permit to construct a road through Izembek, connecting the communities of King Cove and Cold Bay. Benjamin Storey & Tyler Riberio, Alaska Dep't of Transp. & Pub Facilities, Application for Department of the Army Permit (Nov. 19, 2025).

86.     On December 12, 2025, the Corps issued a public notice on AKDOT's permit application and opened a 30-day comment period, which ended on January 12, 2026. U.S. Army Corps of Eng'rs, Alaska Dist., Public Notice of Application for Permit, POA-2010-00286 (Dec. 12, 2025). The only information the Corps posted was a 27-page

notice, consisting of a five-page narrative briefly describing the project and 22 pages of maps.

87. This comment period, which overlapped with numerous holidays, was the only comment opportunity offered to the public.

88. A comment extension was initially granted for 30 additional days. However, it was later revoked without reason.

89. Friends had to specifically ask the Corps for a copy of AKDOT's permit application and any other supporting documents. In response to that request, the Corps provided Friends with AKDOT's permit application (Nov. 19, 2025), which included King Cove to Cold Bay Stream Survey (Oct. 2025), Wetland Delineation Report (Nov. 2025), wetland determination data sheets, and various maps and figures showing the location of road segments. No other agency analyses or evaluations were provided. The Corps did not update its Public Notice to include these documents.

90. Friends submitted timely comments on AKDOT's permit application and the Corps' public notice and attachments. In their comments, Friends identified numerous legal issues with the permit application and the Corps notice, including the lack of sufficient information to comment meaningfully and to determine whether the project would comply with the CWA, that the project purpose was too narrow, the project was not the least environmentally damaging alternative, the project would cause significant degradation, and the Corps' failure to comply with NEPA and ANILCA.

91.     On July 9, 2026, the Corps issued the Permit to AKDOT authorizing construction of a new 18.9-mile, single lane, gravel road, owned by KCC, connecting the community of King Cove to Cold Bay. U.S. Army Corps of Eng'rs, Alaska Dist., Clean Water Act Section 404 Permit, POA-2010-00286 (July 9, 2026) [hereinafter Permit].

92.     The Permit authorizes construction of a road that will be 13 feet wide at the surface and 24 feet wide subgrade, with 113 vehicle turnouts. *Id*. at 1.

93.     The Permit authorizes the discharge of 40,000 cubic yards of gravel and riprap material into waters of the United States. *Id*.

94.     The Permit authorizes the construction of one bridge and installation of 85 drainage culverts. *Id*. The culverts would presumably be installed where the road would intersect 23 perennial streams and 62 drainages with ephemeral, intermittent or seasonal flow. U.S. Army Corps of Eng'rs, Memorandum for Record, Department of the Army Environmental Assessment and Statement of Findings, POA-2010-00286, at 3 (July 8, 2026) [hereinafter Memo].

95.     The Permit authorizes discharge of fill material into 4.58 acres of wetlands and 0.7 acres of stream channels. Permit at 1.

96.     The Permit authorizes the mechanical clearing of wetlands and other waters to construct the road but does not state the extent of damage associated with that activity. *Id*.

97. The Permit authorizes the development of two dedicated gravel and rock mine sites as well as the mining of gravel and rock from 14 additional sites located along the road corridor. *Id.*

98. The total footprint of road construction, including material sites, would be 186 acres. Approximately 1.7 million cubic yards of material would be moved during construction activities, with 1.2 million cubic yards used for road construction and 10,150 cubic yards used as riprap. Memo at 1–2.

99. The Corps simultaneously released a Memo along with the Permit, which was identified as the Corps' "Environmental Assessment, Section 404(b)(1) Guidelines Evaluation, Public Interest Review, and Statement of Findings." *Id.*

100. The Corps determined that an Environmental Assessment (EA) was sufficient under NEPA because, while the project would adversely impact wetlands and other waters of the United States, the road design, siting, and mitigation measures "would prevent significant impacts to the environment." *Id.* at 16.

101. The scope of what the Corps considered in its NEPA analysis was activity "within the proposed 490-acre road right-of-way where the road and material sites would be sited." The Corps included "upland components" that included the road prism, material sites, and staging and turnout areas, all of which fall within this 490-acre road right-of-way. *Id.* at 8.

102. The Corps determined the basic project purpose was to provide public transportation, and thus the project was not water dependent. *Id.* at 9.

103. The Corps accepted the overall project purpose as defined by AKDOT, which was "to provide the residents and businesses of the community of King Cove with safe, reliable and affordable year-round surface transportation to the State of Alaska's all-weather airport at Cold Bay." *Id*.

104. The Corps analyzed two surface transportation alternatives: (1) the Southern Route as the alternative preferred by AKDOT, which follows the 490-acre strip of land transferred to KCC pursuant to an unlawful land exchange agreement that is currently subject to litigation; and (2) the Northern Route. *Id*. at 25.

105. The Southern Route sited the road within the corridor of land that had been transferred to KCC in the land exchange. *Id*.

106. The Corps included a no action alternative "as a baseline" but rejected it because it did not meet the overall project purpose. *Id*.

107. The Corps did not analyze marine alternatives, including a hovercraft, ferry, or landing craft, because those alternatives would not "meet the applicant's needs" according to the Corps. *Id*. at 24–25. The Corps also did not evaluate air alternatives.

108. AKDOT purportedly prepared an Alternatives Analysis that the Corps relied on. *Id*.; *see also id*. at app. B (listing references). That document was not available to the public during the public comment period and has not been made publicly available yet.

109. Based on information that was not shared with the general public prior to issuing the Permit, the Corps determined that AKDOT's preferred alternative, the

Case 3:26-cv-00272     Document 1     Filed 07/22/26     Page 26 of 41

Southern Route, was the least environmentally damaging practicable alternative. *Id*. at 26. The Corps stated that the Southern Route would have less environmental impact because it would traverse private land. *Id*.

110. The Corps determined that the Northern Route was not available because it was "largely in federally designated wilderness" and "would require a land transfer or possibly congressional approval." *Id*. at 26.

111. The Corps determined that "[c]omplete avoidance of waters of the United States was not possible due to the abundance and distribution of wetlands along the existing road corridor owned by King Cove Corporation." *Id*. at 2.

112. The proposed road would be located within the Kinzarof Lagoon watershed. *Id*. at 25. Streams within the road corridor flow south into Kinzarof Lagoon. *Id*. at 3. Wetlands that have a hydrologic connection to Kinzarof Lagoon will be filled and impacted directly by the activities authorized in the Permit. *Id*. at 47.

113. The Corps dismissed direct impacts from filling these wetlands as small because it determined that the "total cumulative disturbance for the road including material sites would be approximately 0.699% of the Kinzarof Lagoon watershed." *Id*.

114. The Corps determined that direct impacts to "the highly valued and important eelgrass bed and lagoon vegetation have been avoided" because the road will be located at least one half mile from the Kinzarof and Izembek Lagoons. *Id*. at 44.

115. The Corps found that an unpaved, gravel road could cause indirect effects including increased erosion and "sedimentation to downstream waters in lagoons

containing eelgrass." *Id*. at 13. The Corps nevertheless determined the any potential

indirect effects to eelgrass would be "local and minor." *Id*. This determination was based

on "best management practices" that would be used during construction to limit erosion

and sedimentation. *Id*.

116.    The Permit only requires "erosion control measures along the perimeter" of

work areas during construction activity. Permit at 5. It does not dictate any specific

measures or specify what best management practices are required. *Id*.

117.    The Permit also requires that disturbed areas be "stabilized immediately

after construction to prevent soil erosion." *Id*. at 7. The Permit requires the use of "sod,

degradable mats, barriers, or a combination of similar stabilizing materials to prevent

erosion." *Id*. at 5. However, there is no discussion about the effectiveness of these erosion

control measures, especially in the harsh environmental conditions present along the road

corridor.

118.    The Corps found that expanded off road vehicle (ORV) use "would impact

wetlands and water courses with soil compaction, erosion, and sedimentation." Memo at

13. The Corps reasoned that ORV use is generally prohibited on the surrounding

federally designated Wilderness lands, and thus concluded that the impacts from

increased ORV use would be mitigated by posting signs to discourage ORV use. *Id*. at

28.

119. In contrast, in the 2013 ROD, Secretary Jewell determined that damage and impacts from illegal ORV use could not be prevented through regulation, enforcement, or roadside barriers. 2013 ROD at 9.

120. A 2024 draft Supplemental EIS for a land exchange for a road through Izembek showed that, after a road was built from Lenard Harbor to the hovercraft terminal near the boundary of Izembek Wilderness, there was an 800% increase in ORV trails within Izembek, which "has resulted in degradation of tundra habitat." U.S. FISH & WILDLIFE SERV., IZEMBEK NATIONAL WILDLIFE REFUGE LAND EXCHANGE/ROAD CORRIDOR DRAFT SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT 3-333 (2024).

121. AKDOT purportedly prepared a document entitled "DOT Rebuttal to FWS analysis of ORV trails with aerial imagery" that the Corps relied on. Memo at 71. That document was not available to the public during the public comment period and has not been made available to the general public yet.

122. The Corps also determined that ORV use may increase and would be allowed for subsistence users. *Id*. at 14, 27. In fact, the Corps stated "ORV trails for subsistence uses would continue to be an integral and functional part of the backcountry experience, as it is in other Alaskan Wilderness lands." *Id*. at 31. The Corps did not consider how this acknowledged and encouraged increase in ORV use would impact waters of the United States.

123. The initial CWA 401 water quality certification issued by the Alaska Department of Environmental Conservation included a condition that required barriers

along the length of the road to reduce unauthorized ORV use in Izembek. That condition was removed after AKDOT objected. *Id*. at 51.

124. The Corps determined that construction activity and the presence of the proposed road could alter water flow patterns, i.e. the hydrologic wetland connectivity and function within the Kinzarof Lagoon watershed. *Id*. at 27.

125. The Corps determined that these water flow impacts could be mitigated by installing culverts that would maintain natural drainage patterns. *Id*. at 54. The specific location of the culverts would "be determined in the field," and the culverts are required to be installed in locations "in sufficient number and size to prevent ponding, dewatering, water diversion between watersheds, or concentrating runoff flows and to ensure that hydrology is not altered." *Id*. The Corps did not discuss or identify specific requirements for the culverts that would be necessary to ensure the hydrology of the area is not impacted.

126. The Corps did not discuss any long-term impacts from the culverts themselves. Nor is there any discussion about the rate of failure for culverts, and the impact of culvert failure on waters of the United States.

127. The Permit only requires a culvert monitoring report for three summer seasons following completion of construction. *Id*. at 55. There is no long-term requirement to monitor the 85 culverts that would be installed along the road.

128. Approximately 186 acres of native soil substrate will be disturbed to build the road. *Id*. at 27.

129. The Corps determined that, due to the history of military use in the area, "[u]nexploded ordinance and contaminated soils may also be present. Izembek Refuge has been the location of several contaminant remediation actions administered by the Corps, Formerly Used Defense Sites program." *Id.* at 3. The Permit requires that all fill material must be clean soil, free from contaminants. *Id.* at 32. However, the Corps determined that testing of the soil is not required because "the proposed material is not likely to be a carrier of contaminants." *Id.*

130. The Corps engaged in very little discussion about the impacts associated with operation of the road. With respect to any impacts discussed, the Corps determined those impacts would be minimal because of the low traffic volume and the small project footprint. *Id.* at 20.

131. The Corps identified that windy and rainy conditions persist year-round in the road corridor. *Id.* at 31. While acknowledging that there could be impacts to wetlands from road run-off and fugitive dust, the Corps does not discuss the extent or severity of those potential impacts, or what specific mitigation measures are necessary to address those impacts for the life of the road.

132. The Corps determined that compensatory mitigation to offset the environmental loss from the unavoidable impacts to waters of the United States from the construction of the road was not required. *Id.* at 47.

133. The Corps determined that the proposed road project was developed and designed to avoid and minimize impacts to wetlands and other special aquatic sites. *Id.*

134. AKDOT proposed that the 1,739 acres of KCC lands transferred to the United States as part of the 2025 Exchange Agreement, which are located in the vicinity of the Kinzarof Lagoon, be considered as compensatory mitigation for the unavoidable loss of wetlands caused by the proposed project. *Id*. at 3. The Corps determined "this proposed mitigation would not be appropriate for compensatory mitigation." *Id*.

135. Despite rejecting the KCC lands from the 2025 Exchange Agreement for compensatory mitigation, the Corps still relied on those lands as a basis to find compensatory mitigation was not required. *Id*. at 47.

136. The Corps did not follow the procedures under ANILCA Title XI prior to issuing the Permit.

## FIRST CLAIM FOR RELIEF
*(Violation of Clean Water Act, 33 U.S.C. § 1344, and implementing regulations)*

137. Friends re-allege, as if fully set forth here, every allegation contained in this Complaint.

138. The Corps may issue a Section 404 permit only "after notice and opportunity for public hearings." 33 U.S.C. § 1344(a).

139. The public notice must "include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment." 33 C.F.R. § 325.3(a).

140. The Corps considered and relied on reports that AKDOT submitted after the public comment period closed. These reports provided pivotal data that the Corps

relied on to make its decision, including information about alternatives, ORV use and related impacts, and mitigation.

141. The failure to provide this information to the public for review and analysis deprived Friends of an opportunity to provide meaningful comment on the proposed road and its impacts to Izembek.

142. Because the Corps failed to provide to the public key information from AKDOT that was pivotal to its Permit decision at any time before or during the comment period, the Corps' decision contravenes the CWA and its implementing regulations, and it is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and without observance of procedure required by law, within the meaning of the APA and should be vacated. 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF**
(*Violation of the Clean Water Act, 33 U.S.C. § 1344, and implementing regulations*)

143. Friends re-allege, as if fully set forth here, every allegation contained in this Complaint.

144. The Corps is prohibited from issuing a Section 404 permit for discharges that would "cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c).

145. The Corps lacked sufficient information upon which to base its factual determinations regarding impacts to Izembek and to determine whether the authorized discharges and the resulting direct, indirect, secondary, and cumulative effects may cause

Case 3:26-cv-00272     Document 1     Filed 07/22/26     Page 33 of 41

and contribute to significant degradation of waters of the United States, and whether the mitigation measures would effectively mitigate any effects. *Id*. § 230.10(c).

146. The Corps' decision to issue the Permit violates the CWA and the Guidelines because the authorized discharges and the resulting direct, indirect, secondary, and cumulative effects will cause and contribute to significant degradation of waters of the United States. *Id*. The direct, indirect, secondary, and cumulative effects of the discharges into the waters of the United States for the road would cause or contribute to significant degradation of the aquatic ecosystems of Izembek.

147. Because the Corps did not have sufficient information to make a determination related to significant degradation and nonetheless issued the Permit for the Izembek road, which would cause or contribute to significant degradation, the Corps' decision contravenes the CWA and its implementing regulations, and it is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and without observance of procedure required by law, within the meaning of the APA and should be vacated. 5 U.S.C. § 706(2).

### THIRD CLAIM FOR RELIEF
(*Violation of the Clean Water Act, 33 U.S.C. § 1344, and implementing regulations*)

148. Friends re-allege, as if fully set forth here, every allegation contained in this Complaint.

---

*Friends of Alaska Nat'l Wildlife Refuges v. U.S. Army Corps of Eng'rs*
Case No. 3:26-cv-00272 Page 34 of 41

149. The Corps is prohibited from issuing a Section 404 permit for discharges if there is a practicable alternative which would have less adverse impacts on the aquatic ecosystem. 40 C.F.R. § 230.10(a).

150. An alternative is practicable "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

151. When a project is not "water dependent," the Corps' regulations create a rebuttable presumption that there are practicable and environmentally preferable alternatives, and such alternatives are presumed to have less adverse impacts "unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3).

152. The Corps determined that the basic project purpose was to provide public transportation, and thus the project was not water dependent.

153. The Corps accepted AKDOT's overall project purpose, which was narrowly limited to providing surface transportation, i.e., a road.

154. The Corps too narrowly defined the overall project purpose such that it unlawfully precluded the existence and consideration of practicable alternatives.

155. Practicable alternatives exist to a road, including a hovercraft, landing craft, ferry, a new airport in King Cove, and a helicopter.

156. The Corps unlawfully rejected the marine alternatives as not meeting the overall project purpose and the air alternatives were not considered at all.

157. The Corps only considered two alternatives: (1) the Southern Route (AKDOT's proposed road on the KCC exchange lands) and (2) the Northern Route (on federal National Wildlife Refuge and Wilderness lands).

158. The Corps determined the Northern Route was not available because of its land status as largely Wilderness, and thus it was not a practicable alternative.

159. The Corps did not have sufficient information to make a determination that the Southern Route was the least environmentally damaging practicable alternative.

160. The Southern Route is not the least environmentally damaging practicable alternative.

161. Because the Corps accepted AKDOT's unlawfully narrow overall project purpose, eliminated non-road alternatives based on that purpose, and did not have sufficient information to make a factually supported determination, the Corps failed to consider practicable alternatives and thus failed to select the least environmental damaging practicable alternative. As a result, the Corps' decision contravenes the CWA and its implementing regulations, and it is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and without observance of procedure required by law, within the meaning of the APA and should be vacated. 5 U.S.C. § 706(2).

### FOURTH CLAIM FOR RELIEF
*(Violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321–4336f)*

162. Friends re-allege, as if fully set forth here, every allegation contained in this Complaint.

163. NEPA requires the preparation of an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

164. NEPA requires all federal agencies to provide a detailed analysis of, a project's direct, indirect, and cumulative environmental impacts. 42 U.S.C. § 4332(2)(C).

165. The Corps' analysis in the EA is insufficient to provide the required analysis of the environmental impacts of issuing the Permit because the Corps failed to adequately analyze the direct, indirect, and cumulative impacts of the road on wetlands, wildlife, tundra, Wilderness, and numerous other sensitive and/or protected resources and failed to adequately analyze the efficacy of proposed mitigation measures.

166. The Corps' analysis in the EA is insufficient to support the finding that the Permit would not have significant impacts because the Corps failed to adequately analyze the direct, indirect, and cumulative impacts of the road on wetlands, wildlife, tundra, and Wilderness, and failed to adequately analyze the efficacy of mitigation measures to alleviate the significant impacts.

167. The Permit constitutes major federal action significantly affecting the quality of the human environment.

The Corps did not complete an EIS prior to issuing the Permit.

168. The Corps' finding that the Permit would not have a significant impact on the environment based on mitigation measures and its decision to issue the Permit allowing for construction of a road through the Refuge without completing an EIS is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and without

observance of procedure required by law within the meaning of the APA and should be vacated. 5 U.S.C. § 706(2).

## FIFTH CLAIM FOR RELIEF
*(Violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321–4336f)*

169. Friends re-allege, as if fully set forth here, every allegation contained in this Complaint.

170. NEPA requires that an agency consider a reasonable range of alternatives. 42 U.S.C. § 4332(2)(C), (F).

171. The Corps set an unreasonably narrow purpose and need for the project, and as a result, only analyzed two action alternatives, the Southern Route and the Northern Route.

172. The Corps did not analyze any action alternatives that did not involve a road, rejecting them as not meeting AKDOT's needs or failing to address them at all.

173. The Corps' findings that non-road alternatives were either not affordable and/or not reliable, and therefore not practicable, and its failure to consider reasonable alternatives to a road is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and without observance of procedure required by law within the meaning of the APA and should be vacated. 5 U.S.C. § 706(2).

## SIXTH CLAIM FOR RELIEF
*(Violation of Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3161–3173)*

174. Friends re-allege, as if fully set forth here, every allegation contained in this Complaint.

175.    ANILCA Title XI requires that transportation systems within conservation system units in Alaska be approved or disapproved through its "single comprehensive statutory authority." 16 U.S.C. § 3161(c).

176.    Title XI mandates the use of specific forms, preparation of an EIS, compliance with specific timelines and public involvement, and that each agency with any permitting authority over a transportation system make eight detailed findings. *Id.* § 3164.

177.    The Permit authorizes construction of a road within Izembek.

178.    The Permit was not issued in compliance with Title XI's procedures.

179.    The Corps decision to issue a permit allowing the construction of a road within Izembek without complying with Title XI is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and without observance of procedure required by law within the meaning of the APA and should be vacated. 5 U.S.C. § 706(2).

180.    Because Title XI mandates that "no action by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole or in part, of any transportation or utility system shall have any force or effect unless the provisions of this section are complied with," the Permit and Memo are null and void. 16 U.S.C. § 3164(a).

**SEVENTH CLAIM FOR RELIEF**
(*Violation of the Wilderness Act, 16 U.S.C §§ 1131–1136*)

181.    Friends re-allege, as if fully set forth here, every allegation contained in this Complaint.

---

*Friends of Alaska Nat'l Wildlife Refuges v. U.S. Army Corps of Eng'rs*
Case No. 3:26-cv-00272                                                      Page 39 of 41

182. The Wilderness Act prohibits permanent roads within Wilderness. 16 U.S.C. § 1133(c).

183. The 2025 Land Exchange and Patent unlawfully transferred lands out of Wilderness to private ownership for the sole purpose of building a road.

184. There is pending litigation over this unlawful transfer of Wilderness lands. Until that litigation is resolved, the legal status of the road corridor within Izembek is unsettled.

185. Because the Wilderness Act prohibits roads, the Corps' decision to issue the Permit is arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA and should be vacated. 5 U.S.C. § 706(2).

## <u>REQUEST FOR RELIEF</u>

Plaintiffs request that the Court grant the following relief:

A. Declare the Defendants' decision to issue the Permit and Memo was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law, in violation of the CWA, NEPA, ANILCA, the Wilderness Act, and the APA;

B. Invalidate, vacate, and set aside the Memo and Permit.

C. Enter appropriate injunctive relief;

D. Award Friends all reasonable costs and fees as authorized by law; and

*Friends of Alaska Nat'l Wildlife Refuges v. U.S. Army Corps of Eng'rs*
Case No. 3:26-cv-00272        Page 40 of 41

Case 3:26-cv-00272 Document 1 Filed 07/22/26 Page 40 of 41

E.    Award Friends such other and further relief as this Court deems just and proper.

Respectfully submitted this 22nd day of July, 2026,


                              s/ Michelle Sinnott
                              Michelle Sinnott (AK Bar No. 1506049)
                              Brook Brisson (AK Bar No. 0905013)
                              TRUSTEES FOR ALASKA

                              *Attorneys for Plaintiffs*