ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

DANIEL J. MARTIN
LAURA J. BROWN
ALEXA PENALOSA
MARK WIDERSCHEIN
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044-7611
(202) 598-1869
Daniel.Martin3@usdoj.gov

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS, et al.,<br><br>Defendants. | Case No. 3:26-cv-272-ACP |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... iii

GLOSSARY OF SHORT FORMS .......... vi

INTRODUCTION .......... 1

LEGAL BACKGROUND .......... 2

FACTUAL AND PROCEDRUAL BACKGROUND .......... 3

I. The Corps' Permit Decision Under Review .......... 3

A. AKDOT Seeks Permit for Discharges Associated with the King Cove Road Project. .......... 3

B. The Corps Issues a Public Notice for the Permit Application. .......... 5

C. The Corps Issues the 404 Permit After Conducting a 404(b)(1) Guidelines Analysis, Including a LEDPA Determination. .......... 5

II. Procedural Background of this Litigation .......... 8

STANDARD OF REVIEW .......... 8

ARGUMENT .......... 10

I. Friends Are Not Likely to Succeed on the Merits of their Clean Water Act Claims. .......... 11

A. The Corps Complied with the Clean Water Act's Notice Requirements. .......... 11

B. The Corps' LEDPA Determination Is Reasonable and Supported by the Record. .......... 14

II. Friends Will Not Suffer Irreparable Harm Before this Case Can Be Decided on the Merits. .......... 19

III. A Preliminary Injunction Is Not in the Public Interest. .......... 20

IV. If the Court Grants the Motion, it Should Significantly Narrow the Requested Relief. .......... 23

CONCLUSION....................................................................................................................23

CERTIFICATES OF COMPLIANCE AND SERVICE ...............................................................24

## TABLE OF AUTHORITIES

**Cases**

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) .......... 21

*Balt. Gas & Elec. v. Nat. Res. Def. Council*,
462 U.S. 87 (1983) .......... 9

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) .......... 9

*Butte Env't Council v. U.S. Army Corps of Eng'rs*,
620 F.3d 936 (9th Cir. 2010) .......... 16

*City of Sausalito v. O'Neill*,
386 F.3d 1186 (9th Cir. 2004) .......... 9

*Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*,
869 F.3d 148 (3d Cir. 2017) .......... 16

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) .......... 21

*E. Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) .......... 21

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) .......... 21

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*,
887 F.3d 906 (9th Cir. 2018) .......... 16, 17, 18

*Friends of the Earth v. Hall*,
693 F. Supp. 904, 948 (W.D. Wash. 1988) .......... 14

*Friends of the Earth v. Hintz*,
800 F.2d 822 (9th Cir. 1986) .......... 9, 18

*Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*,
988 F.2d 989 (9th Cir. 1993) .......... 13

*J.W. ex rel., J.E.W. v. Fresno Unified Sch. Dist.*,
626 F.3d 431 (9th Cir. 2010) .......... 10

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008)
*overruled in part on other grounds*, 555 U.S. 7 (2008) .......... 9, 21

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 9

*Nat'l Wildlife Fed'n v. Marsh*,
568 F. Supp. 985, 995 (D.D.C. 1983) .......... 14

*Native Ecosystems Council v. Dombeck*,
304 F.3d 886 (9th Cir. 2002) .......... 9

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*,
No. 3:18-CV-00437-HZ, 2019 WL 2372591 (D. Or. June 5, 2019) .......... 19

*Seven Cnty. Infrastructure Coal. v. Eagle County.*,
605 U.S. 168 (2025) .......... 9

*Sylvester v. U.S. Army Corps of Eng'rs*,
882 F.2d 407 (9th Cir. 1989) .......... 15, 16, 17

*Town of Abita Springs v. U.S. Army Corps of Eng'rs*
153 F. Supp. 3d 894 (E.D. La. 2015) .......... 12, 13

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 10, 20, 21

**Statutes**

5 U.S.C. §§ 701-706 .......... 9

5 U.S.C. § 706(2) .......... 9

33 U.S.C. §§ 1251-1389 .......... 2

33 U.S.C. § 1251(a) .......... 2

33 U.S.C. § 1311(a) .......... 2

33 U.S.C. § 1344 .......... 2

33 U.S.C. § 1344(a) .......... 2, 11

33 U.S.C. § 1344(b)(1) .......... 2

**Code of Federal Regulations**

33 C.F.R. § 320.4(a)(1) .......... 2

33 C.F.R. § 320.4(j)(2) .......... 15

33 C.F.R. § 325.1(d)(1) .......... 11, 12

33 C.F.R. § 325.1(d)(10) .......... 12, 14

33 C.F.R. § 325.2(a)(1) .......... 12

33 C.F.R. § 325.3(a) .......... 12, 13, 14

33 C.F.R. § 325.3(a)(13) .......... 12

33 C.F.R. § 336.1(c)(11)(ii) .......... 15

40 C.F.R. pt. 230 .......... 2

40 C.F.R. § 230.10(a) .......... 2, 14

40 C.F.R. § 230.10(a)(1) .......... 16

40 C.F.R. § 230.10(a)(2) .......... 15

40 C.F.R. § 230.10(a)(3) .......... 16

**Rules**

Local Rule 16.3(b)(1) .......... 20

Local Rule 16.3(c)(5) .......... 20

## GLOSSARY

| | |
|---|---|
| 404 Permit | Corps' July 2026 Permit to AKDOT |
| 404(b)(1) Guidelines | 40 C.F.R. part 230 |
| AKDOT | Alaska Department of Transportation and Public Facilities |
| Corps | U.S. Army Corps of Engineers |
| Friends | Plaintiffs Friends of Alaska National Wildlife Refuges, Alaska Wilderness League, National Wildlife Refuge Association, Sierra Club, and Wilderness Watch |
| King Cove Road Project | AKDOT's proposed road-building project connecting the community of King Cove with the airport at Cold Bay |
| LEDPA | Least Environmentally Damaging Practicable Alternative |
| WOTUS | Waters of the United States |

## INTRODUCTION

This case is about the validity of a U.S. Army Corps of Engineers ("Corps") Clean Water Act Section 404 permit issued to the Alaska Department of Transportation and Public Facilities ("AKDOT") for discharges of dredged or fill material associated with a proposed road-building project connecting the community of King Cove with the airport at Cold Bay (the "404 Permit"). This project will allow the isolated residents of King Cove to travel by land to access the critical all-weather airport in Cold Bay and, thus, connect them to essential services.

Under the deferential Administrative Procedure Act standard governing judicial review of such permits, the ultimate merits question for this Court to decide is whether the Corps acted wholly unreasonably or inconsistently with the Clean Water Act when it issued the 404 Permit. The Corps did not do so. The 404 Permit is supported by the record and a rational and well-explained exercise of agency authority. Therefore, the Court should ultimately uphold the 404 Permit.

Now, however, the question before the Court is whether to issue a temporary restraining order or preliminary injunction against the 404 Permit, pending this Court's final decision on the merits. The Court should deny the motion for preliminary injunctive relief. Plaintiffs have not met any part of the four-factor equitable test that would warrant such extraordinary relief. Instead, the 404 Permit is well-reasoned and supported by the law and facts, there is no harm to Plaintiffs from the 404 Permit during merits briefing, and the public interest supports keeping the 404 Permit in place.

## LEGAL BACKGROUND

Congress enacted the Clean Water Act, 33 U.S.C. §§ 1251-1389, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id.* § 1251(a). To attain this goal, the Clean Water Act prohibits the discharge of pollutants, including dredged or fill material, into waters of the United States ("WOTUS") without a permit. *Id.* § 1311(a). Section 404 of the Act authorizes the Corps to issue permits for discharges of dredged and fill material into such waters. *Id.* § 1344. The Corps must provide notice and opportunity for a public hearing on permit applications. *Id.* § 1344(a).

Section 404(b) requires the Corps to specify a disposal site for proposed discharges by applying regulations developed in conjunction with EPA. 33 U.S.C. § 1344(b)(1). These regulations, known as the "404(b)(1) Guidelines" and codified at 40 C.F.R. part 230, inform the Corps' review of Section 404 permit applications. 33 C.F.R. § 320.4(a)(1). As part of this review, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences" except as otherwise specified. 40 C.F.R. § 230.10(a). In other words, the Corps must analyze alternatives to the proposed discharge and select the **l**east **e**nvironmentally **d**amaging **p**racticable **a**lternative, referred to as the "LEDPA."

## FACTUAL AND PROCEDRUAL BACKGROUND

### I. The Corps' Permit Decision Under Review

#### A. AKDOT Seeks Permit for Discharges Associated with the King Cove Road Project.

The road-building project begins approximately 23 road miles northwest of King Cove and ends approximately five road miles northwest of Cold Bay, arcing around the isthmus connecting the two communities, to which Kinzarof Lagoon abuts the southern end (the "King Cove Road Project"):




Mot. Ex. 1 at 6.

AKDOT's proposal, as submitted to the Corps, is to construct a new 19-mile, single-lane, unpaved road, on land owned by King Cove Corporation (an Alaska Native Village Corporation). Mot. Ex. 11 at 1. The King Cove Corporation has granted an easement to the Agdaagux Tribe of King Cove, a Federally Recognized Tribe, for the purpose of constructing, operating, and maintaining the road. The purpose of this road is to connect roads in King Cove to the all-weather airport in Cold Bay. *Id.* In October 2025, U.S. Department of Interior entered into a land exchange agreement to convey 490 acres of the Izembek National Wildlife Refuge and Wilderness ("Izembek") to King Cove Corporation for the King Cove Road Project. *Id.* at 3.

The King Cove Road Project would discharge approximately 40,000 cubic yards of gravel and riprap fill material into WOTUS, across 4.58 acres of wetlands and less than one acre of stream channels. *Id.* These discharges require a Clean Water Act permit. AKDOT's plan for the road sought to avoid direct impacts to tidal lagoons and mudflats, the most environmentally detrimental impacts. *Id.* at 2. For minimization, AKDOT would site the road at least half a mile from the nearest tidal lagoon and eelgrass beds, and would follow upland ridges avoiding wetlands "wherever possible." *Id.* Culverts would be designed to maintain natural flow patterns. *Id.* Moreover, all materials sites would be in uplands, not wetlands or stream channels, and in-field delineation will occur to identify project limits, with equipment and staging areas kept out of WOTUS. *Id.* Finally, the permit would require AKDOT to employ best management practices to reduce water quality impacts, such as sedimentation. *Id.*

### B. The Corps Issues a Public Notice for the Permit Application.

In December 2025, the Corps issued a public notice of AKDOT's permit application, as the Clean Water Act requires. Mot. Ex. 1. The notice contained information about the King Cove Road Project's applicant; location; special area designations; purpose; scope of proposed work, including project drawings; information about other required permits and certifications; avoidance, minimization, and compensatory mitigation methods; cultural resources information; endangered species and fish habitat information; requests for Tribal consultation; a solicitation of public comment, including an invitation for the public to request public hearings; and a description of the Corps' authority to act and how the Corps would evaluate the permit. *Id.* at 1–5.

### C. The Corps Issues the 404 Permit After Conducting a 404(b)(1) Guidelines Analysis, Including a LEDPA Determination.

Following public comment and after receiving additional information from AKDOT, the Corps issued the 404 Permit in July 2026. Mot. Ex. 2 at 1. The 404 Permit authorizes AKDOT to complete the King Cove Road Project with discharges to WOTUS "in accordance with" attached and approved plan sheets, and subject to the conditions on how the work would occur, including a pre-construction meeting, clean fill material only, erosion control measures, maintaining natural flow patterns, maintaining a 100-foot undisturbed vegetation buffer, annual culvert monitoring for hydrologic patterns, and fish habitat conservation measures. *Id.* at 4–6.

The Corps supported the permit with a 73-page Memorandum for Record containing the Corps' environmental assessment, Section 404(b)(1) Guidelines analysis, public interest review, and statement of findings. Mot. Ex. 11. at 1. Relevant here, the Corps included a detailed alternatives analysis and determined that the King Cove Road Project as proposed was the LEDPA for the permit application. *Id.* at 23–26. The Corps analyzed several alternative transportation methods between King Cove and Cold Bay, with a no-action alternative (i.e., no permit issued) as the baseline. *Id.* at 25. The King Cove Road Project was then set as the first on-site (surface transportation) alternative and a Northern Route through Izembek Wilderness as a second on-site alternative; off-site (non-road) alternatives included marine options such as a hovercraft, ferry, landing craft, and air travel. *Id.* at 23–26.

To evaluate the alternatives compared to the baseline, the Corps began by evaluating the basic and overall project purposes. The Corps determined that the "basic purpose is to provide public transportation" and the "overall project purpose . . . considering the applicant's underlying objective, is to provide the residents and businesses of the community of King Cove with safe, reliable and affordable year-round surface transportation to the State of Alaska's all-weather airport at Cold Bay." *Id.* at 9.

From those purposes, the Corps first considered whether a road through WOTUS resources was necessary at all, looking at non-road transportation methods to Cold Bay that would meet the stated transportation goals. *Id.* at 23. The Corps first found that air transport was not a practical alternative because it was unreliable in the face of King

Cove's harsh weather: "While there is an existing airstrip in King Cove[,] the air strip is serviced by a single airline and is often hampered by adverse weather and icy runway conditions. The [AK]DOT Cold Bay airport, by contrast, has a paved, longer, protective crosswind runway, and is served by several air carriers." *Id.* at 5. The Corps next concluded that marine alternatives were not practical because of harsh weather, cost, and impacts on endangered species: (1) a hovercraft option was twice the cost of a road, not operable in rough ocean conditions and high winds, and would disturb waterfowl and sensitive endangered species; (2) a marine ferry was four times the cost of a road, would likely be too expensive for King Cove residents, and would disturb endangered species; and (3) using landing crafts would not be reliable because of harsh winds, rough seas, and marine ice. *Id.* at 24. The Corps therefore concluded that no off-site alternatives were practicable. *Id.* at 25.

For on-site alternatives, the Corps evaluated the King Cove Road Project and an alternative route analyzed by AKDOT that would pass through the northern portion of the isthmus to further avoid Kinzarof Lagoon. *Id.* This northern alternative would result in greater environmental impacts than the applied-for route, in large part because it "would cross similar habitat and freshwater wetlands as the southern route but instead would be closer to and within drainages that flow into the highly sensitive Izembek Lagoon . . . the most important wildlife habitat and the primary habitat for which the refuge was established." *Id.* at 25-26. Moreover, the northern route would pass largely through

federal wilderness and would therefore "require a land transfer or possibly congressional approval" to be available for road-building. *Id.* at 26.

The Corps concluded that the King Cove Road Project was the LEDPA for AKDOT's purpose.

## II. Procedural Background of this Litigation

Plaintiffs Friends of Alaska National Wildlife Refuges, Alaska Wilderness League, National Wildlife Refuge Association, Sierra Club, and Wilderness Watch (collectively, "Friends") initiated this action on July 22, 2026. Dkt. No. 1.

Friends challenge the Corps' decision to issue the 404 Permit for the King Cove Road Project. They allege violations of the Clean Water Act, National Environmental Policy Act, Alaska National Interest Lands Conservation Act, Wilderness Act, and Administrative Procedure Act. Dkt. No. 1 at 1. Friends have also moved for a temporary restraining order or preliminary injunction (the "Motion"). Dkt. No. 8. However, in the Motion, Friends only assert two Clean Water Act claims as their basis for likelihood of success on the merits: failure to provide statutorily required notice and an unreasonable LEDPA determination.

## STANDARD OF REVIEW

Review on the merits here is governed by the APA. 5 U.S.C. §§ 701-706; *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-06 (9th Cir. 2004). Under the APA, courts review final agency action under the highly deferential standard of 5 U.S.C. § 706(2). *Lands Council v. McNair*, 537 F.3d 981, 992-94 (9th Cir. 2008) (en banc), *overruled in*

*part on other grounds*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Agency decisions may be overturned only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (citation omitted). That standard of review is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

An agency action will be upheld if the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made. *Balt. Gas & Elec. v. Nat. Res. Def. Council*, 462 U.S. 87, 105-06 (1983). Courts should uphold agency action, even if it is of "less than ideal clarity," if "the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). The court may not set aside the Corps' determinations as arbitrary or capricious "unless there is no rational basis for the action." *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986). Review of agency decisions that are of a scientific or technical nature within the agency's area of expertise, such as those here, must be at its "most deferential." *Seven Cnty. Infrastructure Coal. v. Eagle County,* 605 U.S. 168, 182 (2025). As the "party challenging the administrative decision," plaintiffs "bear[] the burden of persuasion." *J.W. ex rel., J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010).

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def.*

*Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must prove (1) that it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20.

**ARGUMENT**

The Corps' permit decision is a reasoned exercise of agency discretion supported by a robust administrative record. Friends are not likely to succeed on the merits of either their claim that the project lacked the requisite notice, because the Corps complied with the Clean Water Act's statutory requirements, or their claim that the Corps made an unreasonable LEDPA determination, because AKDOT's proposed route is the least damaging option for the road project. Nor have Friends demonstrated that irreparable harm will occur during the pendency of this litigation because the Court can adjudicate this matter on the administrative record before any discharges to WOTUS occur.

Moreover, to the extent that the Court has a serious question about the merits and finds that Friends have demonstrated irreparable harm, the Court should decline to issue an injunction because the balance of hardships does not tip sharply in favor of Friends. Rather, keeping the permit in place is in the public interest for regulatory certainty during preliminary construction outside of WOTUS.

## I. Friends Are Not Likely to Succeed on the Merits of their Clean Water Act Claims.

To support their assertion that they are likely to succeed on the merits, Friends argue that the Corps violated the Clean Water Act in two ways: First, by failing to provide sufficient notice, and second, by unreasonably determining the LEDPA. Neither of these arguments is persuasive because the Corps followed the Clean Water Act and Section 404(b)(1) guidelines for both its public notice issuance and LEDPA determination.

### A. The Corps Complied with the Clean Water Act's Notice Requirements.

The Corps may issue permits only after "notice and opportunity for public hearings." 33 U.S.C. § 1344(a). The deadline for this public notice is fifteen days after receipt of a complete application. *Id.*

Corps regulations implement this statutory requirement. First, an application must be "complete" to trigger the notice requirement. Generally, an application "must include a complete description of the proposed activity including necessary drawings, sketches, or plans sufficient for public notice." 33 C.F.R. § 325.1(d)(1). Detailed engineering plans and specifications are not required. The application must describe "the location, purpose and need for the proposed activity; scheduling of the activity; the names and addresses of adjoining property owners; the location and dimensions of adjacent structures; and a list of authorizations required by other federal, interstate, state, or local agencies . . . including all approvals received or denials already made." *Id.* If the application is

incomplete, the Corps must request from the applicant any additional information necessary for a complete application. *Id.* § 325.2(a)(1).

Because completion is defined by the sufficiency of the submitted materials to warrant public notice, completeness is controlled by Corps regulations that govern the content of a public notice. Public notice serves as "the primary method of advising all interested parties of the proposed activity for which a permit is sought and of soliciting comments and information necessary to evaluate the probable impact on the public interest." *Id.* § 325.3(a). Accordingly, "[t]he notice must . . . include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment." *Id.* Further, the regulation lists items of information that should be incorporated into the notice, including in relevant part "[a]ny other available information which may assist interested parties in evaluating the likely impact of the proposed activity, if any, on factors affecting the public interest." *Id.* § 325.3(a)(13). However, "[t]he issuance of a public notice will *not be delayed* to obtain information necessary to evaluate an application." *Id.* § 325.1(d)(10) (emphasis added).

The Corps correctly followed these statutory and regulatory requirements when it issued the December 2025 notice. This case is remarkably similar to *Town of Abita Springs v. U.S. Army Corps of Engineers*, where the plaintiffs also argued that "the Corps' notice did not include enough information to generate meaningful comment," especially because the Corps relied on information submitted by the applicant after the Corps issued the public notice. 153 F. Supp. 3d 894, 909 (E.D. La. 2015). In that case, the

court rejected the challenge, explaining that "nothing in the C[lean] W[ater] A[ct] or the implementing regulations requires that the Army Corps allow an opportunity for the public to comment on an applicant's response to the original public comments." *Id.* at 915. Otherwise, the public comment period would continue in a never-ending circle. *Id.* Instead, the relevant inquiry was whether the notice contained all the information required by 33 C.F.R. § 325.3(a). 153 F. Supp. 3d at 915.

Here, the Corps complied with these requirements by including all necessary information in the public notice required by the regulations. *See Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 996 (9th Cir. 1993) (holding public notice sufficient that described project, discussed wetlands impacts and fish habitat mitigation, and notified the public of Corps' intent to consult with other agencies regarding potential effects on endangered species, cultural resources and water quality). By describing the King Cove Road Project's location; special area designations; purpose; scope of proposed work, including project drawings; information about other required permits and certifications; avoidance, minimization, and compensatory mitigation methods; cultural resources information; and endangered species and fish habitat information, the public notice "include[d] sufficient information to give a clear understanding of the *nature and magnitude of the activity* to generate meaningful comment." 33 C.F.R § 325.3(a) (emphasis added). More precise details, such as AKDOT's alternatives analysis, were not required by the Corps' regulations.

Friends' cases to the contrary are inapposite. Both *National Wildlife Federation v. Marsh* and *Friends of the Earth v. Hall*, which relied heavily on *Marsh*, addressed a scenario where the public did not have an opportunity to comment on information the courts deemed essential, pivotal, or even "the single most important feature of the [permitted] project." *See Hall*, 693 F. Supp. 904, 948 (W.D. Wash. 1988); *Marsh*, 568 F. Supp. 985, 995 (D.D.C. 1983). While the Corps maintains that those cases were wrongly decided and they are only persuasive authority here in any case, the Environmental Document and Alternatives Analysis prepared by AKDOT here does not rise to that standard. This road project has been the subject of public debate and comment for over 50 years — no one can credibly maintain that Friends lacked sufficient information about the project to provide adequate public comment to the Corps. Instead, AKDOT's later submission was "information necessary to evaluate an application," which does not delay the public notice. 33 C.F.R. § 325.1(d)(10).

### B. The Corps' LEDPA Determination Is Reasonable and Supported by the Record.

The 404(b)(1) Guidelines provide that "no discharge of dredged or fill material shall be permitted" unless the proposed project is performed in a manner that is the LEDPA. 40 C.F.R. § 230.10(a). If no other practicable alternatives exist, or if other practicable alternatives are more environmentally damaging, the Corps may approve the project as the LEDPA.

To determine whether an alternative is practicable, the Corps must first determine the "overall project purposes." *Id.* § 230.10(a)(2). In defining the overall project purpose, "the Corps has a duty to consider the applicant's purpose" and "the objectives of the applicant's project." *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989). "Indeed, it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable." *Id.* Thus, while the permit applicant may not define its purpose narrowly "to preclude the existence of any alternative sites and thus make what is practicable appear impracticable," the Corps may not reject a "genuine and legitimate" purpose. *Id.* Importantly for this case, the Corps will "normally accept decisions" by state, local, and tribal governments with respect to "zoning and land use matters," unless "there are significant issues of overriding national importance." 33 C.F.R. § 320.4(j)(2). Likewise, when the Corps approves or undertakes projects requiring the discharge of material into WOTUS, it must consider "officially adopted state, regional, or local land use classifications, determinations, or policies." *Id.* § 336.1(c)(11)(ii).

Next, the Corps must analyze the practicable alternatives. "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). The term "practicable alternatives" includes "[a]ctivities which do not involve a discharge of dredged or fill material into" WOTUS and "[d]ischarges of

dredged or fill material at other locations in" WOTUS. *Id.* § 230.10(a)(1). Before issuing a permit, the Corps must determine that the proposed project is the LEDPA.

As part of this analysis, the Corps must determine whether a project is "water dependent." *Id.* § 230.10(a)(3). A project that "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose" is not water dependent. *Id*. In this regard, a project's "basic purpose (for determining water dependency) is distinct from the overall purpose (for determining practicable alternatives)." *Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*, 869 F.3d 148, 157 (3d Cir. 2017) (emphasis omitted). When a project's basic purpose is not water dependent, "practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3).

The Corps' determination that a project's basic purpose is not water dependent, however, "does not serve as an automatic bar to issuance of a permit." *Sylvester*, 882 F.2d at 409. It "simply necessitates [the applicant make] a more persuasive showing than otherwise concerning the lack of alternatives." *Id.* Thus, "when the Corps recognizes that a project is not water dependent, considers a range of alternative sites for the project, and concludes that there are no practicable alternative sites available, the presumption is rebutted." *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 912 (9th Cir. 2018); *see also Butte Env't Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 945 (9th Cir. 2010) (holding that "the Corps applied the proper presumption and found that it had been rebutted" because "the Corps acknowledged that the proposed project

was not water dependent" and reviewed "over a dozen alternative sites"). The Court must defer to the Corps' approval of an alternative when the Corps applies this standard. *Friends of Santa Clara River*, 887 F.3d at 912.

The Corps correctly applied this standard in this case to conclude that the King Cove Road Project was the LEDPA for AKDOT's application. While Friends complain that the Corps erred by too narrowly defining the overall project purpose, their Motion fails to demonstrate any error made by the Corps in its LEDPA analysis.

First, the Corps accepted AKDOT's "genuine and legitimate" overall project purpose as surface transportation. *See Sylvester*, 882 F.2d at 409. But, as required by the 404(b)(1) Guidelines, the Corps differentiated between the project's basic purpose and overall project purpose. The Corps determined that the basic purpose was transportation between King Cove and Cold Bay, which was not water-dependent, and thus explored alternatives that did not impact aquatic sites. Mot. Ex. 11 at 9, 23–25.

Second, as discussed above, the Corps determined that non-road purposes were not practicable because of capital cost, operating cost, reliability, and/or deleterious effects on wildlife. *Id.* at 24. The Corps therefore concluded that no non-road alternatives were practicable alternatives. *Id.* at 25.

Third, the Corps examined another possible road alternative but rejected it as not the LEDPA because it would be more harmful to WOTUS and the Izembek ecosystem. *Id.* at 26.

Thus, because the Corps (1) recognized that the project is not water dependent, (2) considered a range of alternative sites for the project, and (3) concluded that no practicable alternative sites are available, the Corps rebutted the presumption that the King Cove Road Project was not the LEDPA. *See Friends of Santa Clara River*, 887 F.3d at 912.

Friends' contrary argument appears to be that, when any permit application proposes a project that would harm WOTUS and has no practicable alternatives, the Corps must deny the permit. *See* Mot. at 17 ("The Corps considered only one alternative that it could deem practicable."). But that is not the law; Clean Water Act Section 404 by its very nature contemplates the Corps granting permits for activities that discharge dredged or fill material to WOTUS. Harm to WOTUS from such activities is redressed through the permitting process by avoidance, minimization, and compensatory mitigation. *See* 40 C.F.R. subparts H and J. Thus, the Corps did not violate the Clean Water Act here merely because there is no other practicable alternative to a road that would provide reliable and reasonably affordable transportation infrastructure between King Cove and Cold Bay.

Friends' fallback position is that the Corps' exclusion of a ferry option is unsupported by the record, but Friends have failed to meet the high burden of showing that the Corps' findings have "no rational basis." *Hintz*, 800 F.2d at 831. Instead, Friends incorrectly assert without citation that it is "insufficient" for the Corps to have relied on AKDOT's alternatives analysis. Mot. at 19. "The Corps' regulations do not require the

Corps to undertake an independent investigation or to gather its own information upon which to base" its decision. *Hintz*, 800 F.2d at 834–35 (holding that the Corps may rely "upon information supplied by the applicant"). The record contains sufficient basis for the Corps to have determined that the cost of a ferry was impracticable. *See, e.g.,* Mot. Ex. 11 at 24; Mot. Ex. 13 at 72. Moreover, the Corps did not rely solely on cost to reject the ferry analysis, but also explained that a ferry would likely be too expensive for King Cove residents and would disturb endangered species, making it impracticable to meet the project's purpose of transportation from King Cove to Cold Bay. Mot. Ex. 11 at 24.

Friends are therefore unlikely to succeed on the merits.

## II. Friends Will Not Suffer Irreparable Harm Before this Case Can Be Decided on the Merits.

Next, Friends have failed to establish irreparable harm absent an injunction. Friends' asserted irreparable harm here is to their members' ability to use and experience Izembek without the harm that would assertedly be caused by building a road. But at the preliminary-injunction stage, "the relevant inquiry is whether the requested relief is necessary to avoid irreparable harm during the interim period that the relief is to be provided." *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, No. 3:18-CV-00437-HZ, 2019 WL 2372591, at *7 (D. Or. June 5, 2019) (internal quotations and emphasis omitted). Here, ample time exists for the parties to fully brief this case before any permit-authorized discharges to WOTUS occur in 2027.

Because the 404 Permit does not authorize the road-building project as a whole, but only the project's discharges into WOTUS, the relevant harm to Friends' members, if any, is harm to their environmental interests caused by those discharges. AKDOT has explained in a declaration, that no construction that causes discharges to WOTUS will occur on this project before the end of 2026. Lockwood Declaration, Dkt No. 18-2, ¶ 16. Therefore, no irreparable harm exists before the end of the year for the purpose of the Court's preliminary injunction analysis.

Completing merits briefing before the end of 2026 is likely and reasonable. Under the Court's local rules, briefing can be completed within 148 days. The Local Rules require that the Corps file the administrative record by the end of September. Friends' opening brief will be due 30 days after the Corps files the administrative record, with the Corps' brief in opposition due 30 to 44 days later, and Friends' reply due 14 days after that. LCR 16.3(c). If Friends do not seek any extensions  to expedite briefing before the Court, *see* LCR 16.3(c)(5), there will be a maximum of 88 days for briefing after the Corps files the administrative record, meaning briefing will be fully concluded this year. *See* LCR 16.3(b)(1)

Accordingly, there is no harm to Friends caused by permit-authorized discharges to WOTUS during the pendency of merits briefing.

## III. A Preliminary Injunction Is Not in the Public Interest.

Friends also fail to demonstrate, as they must, that the balance of equities tip in their favor, and that a preliminary injunction would serve the public interest. *See Winter*,

555 U.S. at 20. When the government is a party, the analyses of the public interests and balance of equities merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). In considering the balance of the equities between the parties, traditionally a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter,* 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village Of Gambell*, 480 U.S. 531, 542 (1987)). Without the requisite showing on the merits and irreparable harm, a court "need not dwell on the final two factors" and "when considered alongside the [movant's] failure to show irreparable harm, the final two factors do not weigh in favor of a stay." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778-79 (9th Cir. 2018).

Friends fail to show that the public interest and balance of the equities weigh in favor of a preliminary injunction. Friends broadly allege that there is a public interest in preserving nature and avoiding irreparable environmental injury. Mot. at 25. And they repeat their flawed argument that road construction is likely to cause imminent irreparable injury to the environment. *Id.* at 24. First, Friends fail to demonstrate the imminency of harm—the State has represented that the first stages of construction are not within WOTUS. Lockwood Declaration, Dkt No. 18-2, ¶ 16. Friends worry that "road construction will irreparably harm wetlands . . . and lead to an increase in unauthorized ATV use." Mot. at 24. The Ninth Circuit has repeatedly "declined 'to adopt a rule that *any* potential environmental injury *automatically* merits an injunction.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010) (quoting *Lands Council*, 537 F.3d at

1005) (emphasis in original). Here, Friends' argument falls short because it assumes, without any support, that the mitigation required by the 404 Permit will not make up for any loss in wetland functions. Moreover, nothing in the 404 Permit authorizes increased ATV use. Friends also broadly allege there is a public interest in seeing that the Corps complies with the law. Mot. at 25. But, as explained above, Plaintiffs have not demonstrated that they are likely to succeed on the merits of their claims and, thus, have not demonstrated the 404 Permit is unlawful.

The Court must consider harm to the King Cove community as well. The King Cove community has been advocating for a road connection to Cold Bay for half a century, as the absence of such a connection has had significant adverse health and social effects on the people of King Cove. *See* Alaska Opp. to Mot. for TRO/PI, Dkt No. 18, at 27-33. While Friends posit that a delay to "health, economic, or subsistence benefit from the use of the fully-constructed road" will be minimal, Mot. at 25, that harm is certainly substantial to King Cove residents. Further, given the limited construction season and strict sequencing that is required for construction, any delay, particularly during this year's remaining construction season, would not be a mere delay of weeks or months, but possibly a year or more.

Accordingly, given the limited scope of planned construction and the harms of unnecessary delay, the public interest and balance of equities factors weigh in favor of denying the injunction or are, at most, neutral. Because Plaintiffs are unable to show irreparable harm, they are not entitled to a preliminary injunction.

## IV. If the Court Grants the Motion, it Should Significantly Narrow the Requested Relief.

Even if the Court is inclined to grant preliminary injunctive relief here, it should decline to enter Friends' overbroad proposed injunction. Dkt. No. 8-28. The injunction is overbroad insofar as it seeks to enjoin all "ground-disturbing" activities. The 404 Permit covers only discharges of dredged or fill material into WOTUS, and so if Friends succeed on the merits they will at most prevent AKDOT from performing construction work that entails those discharges—not all construction work on the road. Thus, any injunction should run only against construction activities that discharge dredged or fill material into WOTUS.

## CONCLUSION

For these reasons, the Court should deny the Motion.

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

By: /s/ *Daniel J. Martin*
DANIEL J. MARTIN
LAURA BROWN
ALEXA PENDOLOSA
MARK WIDERSCHEIN
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044-7611
202-598-1869
Daniel.Martin3@usdoj.gov
*Attorneys for Defendants*

**CERTIFICATES OF COMPLIANCE AND SERVICE**

I hereby certify that I filed this document on the Court's docket via the Court's CM/ECF system, which will cause a copy to be filed on all parties.

I hereby certify that this document complies with Local Civil Rule 7.4 because it contains fewer than 5700 words. As calculated by Microsoft Word, excluding those parts of the brief subject to Rule 7.4(a)(4), this response contains 5700 words.

August 7, 2026

/s/ *Laura J. Brown*
LAURA J. BROWN